# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| BRENDA SZALANSKI, on behalf of herself, individually, and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>MIKE ARNOLD, LEA GEREND, PHIL TROIA, MIKE WHALEY and GREATBANC TRUST COMPANY,<br><br>    Defendants,<br><br>    and<br><br>PDQ FOOD STORES, INC. EMPLOYEE STOCK OWNERSHIP PLAN,<br><br>    Nominal Defendant. | Case No.: 19-cv-940-wmc |

**DEFENDANT GREATBANC TRUST COMPANY'S MEMORANDUM
IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT**

I.     **Introduction**

Plaintiff's first Amended Complaint ("FAC") asserts claims against GreatBanc Trust Company ("GreatBanc") and the four executives that this Court previously dismissed (the "Individual Defendants") related to PDQ's October 2017 asset sale to Kwik Trip, Inc. ("Kwik Trip") (the "Transaction"). The Court thoroughly summarized that Transaction and the accompanying 88-page Confidential Participant Information Statement (the "Information Statement") in its prior Opinion and Order granting Defendants' Motions to Dismiss. (*See* Doc. 47).[1]

Like her original Complaint, Plaintiff does not challenge the Transaction as a whole or the extraordinary profits it created for her and the other ESOP participants—a return of more than 162% on the value of their stock from just nine months earlier ($6,672.60 per share to the transaction price of approximately $17,500 per share). The Amended Complaint alleges only that GreatBanc violated ERISA because it followed the ESOP participants' direction and "proceeded to vote the shares of the PDQ ESOP in favor of the Transaction" despite three so-called "side payments" to the Individual Defendants (*e.g.*, FAC ¶¶ 2, 53, 67). Specifically, Plaintiff brings claims against GreatBanc under ERISA section 406(a)(1)(D) (Count I) and ERISA section 404(a)(1) (Count III) based on the following:

1)     PDQ's payment of $4.96 million to the Individual Defendants owed under a Stock Appreciation Rights Plan (the "SARs Plan") and Grant Agreements that were established and unchanged since 2009—eight years before the Transaction (the "2009 SARS Plan Payment").[2]

---

[1] The Information Statement (Doc. 21-1) is again expressly cited and incorporated in the Amended Complaint, and thus properly considered with the Amended Complaint on this Rule 12(b)(6) motion to dismiss. *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012); *Williams v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

[2] The SARs Plan and Grant Agreements are also cited and incorporated in the Amended Complaint (*e.g.*, FAC ¶¶ 48-50), and therefore appropriately considered with the Amended Complaint on this Rule 12(b)(6) motion to dismiss. *See* n.1, *supra*. The SARs Plan and Grant Agreements are attached as **Exs. 3-7** of the Declaration of Lea Gerend submitted with the Individual Defendants' Motion to Dismiss, which GreatBanc cites to avoid duplicative filings of exhibits.

2)  an enhancement to the Transaction price that provided an additional payment from Kwik Trip of up to $1.85 million to PDQ (and the ESOP) and up to $1.85 million to the Individual Defendants if the Individual Defendants successfully negotiated long-term leases or purchases of select properties on behalf of Kwik Trip after the Transaction (the "Lease Incentive").

3)  severance payments to approximately thirty management-level PDQ employees, who were not expected to be retained by Kwik Trip (the "Severance Payments").

As explained below, the Amended Complaint fails to state any claim against GreatBanc based on the fact the Transaction included these three deal points. Indeed, after Plaintiff reviewed "voluminous documents . . . produced in discovery, including documents produced by GreatBanc, the Individual Defendants, and various non-parties" (Doc. 54 at p. 4), her Amended Complaint and the documents incorporated in it conclusively demonstrate that she has no actionable claim against GreatBanc. The Amended Complaint should be dismissed with prejudice.

**II.   Argument**

**A.   Rule 12(b)(6) Standard**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual allegations to state claims for relief that are facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility requires "factual content sufficient for a court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id. See also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Nor do "'naked assertion[s]' devoid of 'further factual development." *Id.* (quoting *Twombley*, 550 U.S. at 557). In considering a Rule 12(b)(6) motion to dismiss, a court properly considers documents referenced in the complaint and central to it, in addition to the allegations in the complaint. *See Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012); *Williams v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

B.     The Two Causes of Action Against GreatBanc

The Amended Complaint asserts two causes of action against GreatBanc for following the ESOP participants' direction and voting the shares of the PDQ ESOP in favor of the Transaction despite the 2009 SARs Plan Payment, the Lease Incentive, and the Severance Payments.

Count I asserts a claim against GreatBanc for violations of ERISA section 406(a)(1)(D), 29 U.S.C section 1106. Section 406(a)(1)(D) states that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D). The Supreme Court has explained that Section 406 was enacted to address "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length." *Lockheed Corp. v. Spink*, 517 U.S. 882, 893 (1996). "What the 'transactions' identified in § 406(a) thus have in common is that they generally involve uses of plan assets that are potentially harmful to the plan." *Id.*

Count III asserts a claim against GreatBanc for violations of ERISA section 404(a)(1)(A) and (B), 29 U.S.C section 1104. "In order to state a claim for breach of fiduciary duty under ERISA, the plaintiff must plead '(1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff.'" *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016) (quoting *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 464 (7th Cir. 2010)); *Howell v. Motorola, Inc.*, 633 F.3d 552, 565 (7th Cir. 2011). Regarding the second breach-of-duty element, "ERISA imposes duties of loyalty and prudence on a plan fiduciary. 29 U.S.C. § 1104(a)(1)(A)-(B)." *Allen*, 835 F.3d at 678. "Loyalty requires a fiduciary to act 'for the exclusive purpose' of providing benefits to participants." *Id.* (quoting § 404(a)(1)(A)) ("[A] fiduciary shall discharge his duties with respect to a plan solely in the interest

3

of the participants and beneficiaries[.]"). "Prudence requires the fiduciary to act 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.'" *Id.* (quoting § 404(a)(1)(B)).

    **C.**    **Plaintiff Fails to State a Claim Based on the 2009 SARs Plan Payment**

The SARs Plan was adopted "in 2009 for the purpose of providing additional compensation to retain the [Individual Defendants] and incentives to grow the Company and increase its value for the sole shareholder", and its "payment terms . . . have not been modified since its adoption in 2009[.]" (Information Statement, Doc. 21-1 at p. 17 of 89; SARs Plan, **Ex. 3** to L. Gerend Declaration at § 1.) On April 30, 2009, (the "Grant Date"), a total of 737.5 SARs units were granted to the Individual Defendants pursuant to four separate Grant Agreements. (*See* Grant Agreements, **Exs. 4-7** to L. Gerend Declaration.) Specifically, Mike Arnold received 200 units, Lea Gerend received 175 units, Mike Whaley received 181.25 units, and Phil Troia received 181.25 units. (*Id.* at § 2, Ex. B.) Those 737.5 SARs units remained unpaid and outstanding at the time of the Transaction. (*See* Information Statement, Doc. 21-1 at pp. 43 of 89) (". . .(737.5 units) are currently granted") and p. 86 of 89 (". . . there are 737.500 stock appreciation rights ('SARs') currently outstanding.")

Plaintiff's sole allegation of wrongdoing related to the 2009 SARs Plan Payment is a suggestion that the Individual Defendants used the Transaction to improperly vest some portion of the 737.5 SARs units that were otherwise unvested. (*See* FAC ¶ 49.). Not so. The SARs Plan and Grant Agreements unambiguously refute this improper-vesting allegation of wrongdoing, and the "unambiguous contract controls over contrary allegations in the plaintiff's complaint" when considering a motion to dismiss. *McWane, Inc. v. Crow Chi. Indus.*, 224 F.3d 582, 584 (7th Cir. 2000).

Contrary to Plaintiff's allegation about improper vesting, all 737.5 SARs units had already 100% vested on the 6th Anniversary of the Grant Date—i.e., April 30, 2015—more than *two years prior* to the Transaction. (*See* Grant Agreements, **Exs. 4-7** to L. Gerend Decl. at § 3(a)) (setting forth the same vesting schedule). Moreover, even if the SARs units had not already 100% vested in 2015—and they had—the Grant Agreements further provided that the Individual Defendants would "immediately vest in 100% of his/her Stock Appreciation Rights. . . if (i) there is a Change in Control of PDQ during Participant's employment." (*Id.* at § 3(b).)

Plaintiff does not—and cannot—dispute that the 2009 SARS Plan and Grant Agreements contractually required payment to the Individual Defendants of all vested SARs units as a result of the Transaction because it was a "Change of Control." (*See, e.g.*, SARs Plan, **Ex. 3** to L. Gerend Declaration at § 2(b), (e), (l); § 6; Grant Agreements, **Exs. 4-7** to L. Gerend Declaration at § 4.) Indeed, Plaintiff alleges that a "Change of Control" like the Transaction "*requires* payment of any vested Stock Appreciation Rights" pursuant to the SARS Plan. (FAC ¶ 49) (emphasis added); *see also* (Order, Doc. 47 at 4, n3) (stating the 2009 SARs Plan Payment was a "liability PDQ was contractually obligated to pay at the time of the transaction"). Plaintiff likewise does not challenge or allege any error with how the amount of the 2009 SARs Plan Payment was calculated, stating that "[a]ccording to a financial analysis of the Transaction performed by Enterprise Services, Inc. addressed to the PDQ, Inc., Board of Directors, and based on the terms of the [SARS Plan], PDQ, Inc. paid the SAR Payout." (FAC ¶ 47.)

Thus, the Amended Complaint and documents incorporated in it establish only that PDQ properly fulfilled a longstanding contractual obligation to the Individual Defendants, i.e., payment of all SARs units which were 100% vested. The portions of Count I and Count III based on the 2009 SARs Plan Payment should therefore be dismissed.

Start with Count I, which alleges GreatBanc violated ERISA section 406(a)(1)(D). Recall that section 406(a)(1)(D) states that a fiduciary shall not "cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D). First, GreatBanc did not "cause" the 2009 SARs Plan Payment; it was caused (as Plaintiff admits) by the 2009 contractual agreements between PDQ, Inc. and the Individual Defendants. Second, the ESOP did not "engage in" the 2009 SARs Plan Payment because it was between PDQ and the Individual Defendants based on prior enforceable contractual commitments. Third, the 2009 SARs Plan Payment did not involve the "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan"—both of which would also be required for any actionable claim under ERISA section 406(a)(1)(D). 29 U.S.C. § 1106(a)(1)(D). The portion of Count I based on the 2009 SARs Plan Payment should therefore be dismissed.

The same is true of the portion of Count III based on the 2009 SARs Plan Payment. Count III alleges in relevant part that GreatBanc breached its fiduciary duties under ERISA section 404(a)(1)(A) and (B) by following the ESOP participants' voting direction in favor of the Transaction despite the 2009 SARs Plan Payment. As established above, however, the only allegation of wrongdoing related to the 2009 SARs Plan Payment—i.e., improper vesting of unvested shares—is disproven by the unambiguous terms of the 2009 SARs Plan and the Grant Agreements. It is not plausible that GreatBanc breached a fiduciary duty to the ESOP by PDQ's fulfillment of an undisputed contractual obligation that was established 8 years *before* GreatBanc was even appointed as ESOP trustee. And even were an actionable breach plead, any claim based on the 2009 SARs Plan Payments would still fail because there are no plausible allegations "that

6

the breach resulted in harm to the plaintiff." *Allen*, 835 F.3d at 678. The portion of Count III based on the 2009 SARs Plan Payment should be dismissed.

### D.     The Claims Based on the Lease Incentive and Severance Payments Fail

The remaining portions of Count I and Count III based on the Lease Incentive and Severance Payments should also be dismissed. Like the 2009 SARs Plan Payment, the fact the Transaction included those two alleged "side payments" is not sufficient to state claims against GreatBanc under ERISA section 406(a)(1)(D) or ERISA section 404(a)(1).

#### i.     The Lease Incentive

As part of the Transaction, Kwik Trip assumed PDQ's leases on a number of properties for which Kwik Trip desired to secure a long term lease or outright purchase. (Information Statement, Doc. 21-1 at p. 42 of 89.) Kwik Trip demanded that four of those properties required an aggregate $3.2 million *decrease* in the purchase price it paid to PDQ, *unless* the Individual Defendants could successfully negotiate long-term leases or purchases of these properties at market rates on behalf of Kwik Trip within 18 months of closing. (*Id.*; *see also* Ex. A to Information Statement, Doc. 21-1 at p. 32 of 89; Ex. D to Information Statement (Asset Purchase Agreement), Doc. 21-1 at § 7.1(c) p. 62 of 89, § 8.8 p. 69 of 89; Ex. E to Information Statement (Prairie Fairness Opinion), Doc. 21-1 at p. 84-85 of 89.) If the Individual Defendants were successful in their efforts, Kwik Trip would pay up to the full $3.2 million "Lease Adjustment", and any such increase in the purchase price would be split 50/50 between the Individual Defendants and PDQ. (*Id.*)[3] Thus, the Lease Incentive provided a means for PDQ and the ESOP (through the efforts of the Individual Defendants post-

---

[3] Any remaining amounts left over from the COBRA Escrow were also added to the $3.2 million Lease Adjustment, resulting in a total potential amount of $3.7m that could be earned back and split 50/50 between the Individual Defendants (potential $1.85m) and PDQ (potential $1.85m) through an alternating 70/30 waterfall structure. (*Id.*)

closing) to increase the amount of Transaction proceeds that they otherwise would not have realized.

Regarding Count I, the Lease Incentive does not constitute a prohibited transaction under ERISA section 406(a)(1)(D). The purpose of the incentive was not to "use" or "transfer" any "assets of the plan" for the benefit of a party in interest as required for a violation of section 406(a)(1)(D), but just the opposite: to earn money from Kwik Trip for PDQ (and ultimately the ESOP shareholder) that PDQ (and the ESOP shareholder) otherwise would have lost as a "Lease Adjustment" to the purchase price. Such an incentive increasing the Transaction proceeds through the efforts of the Individuals Defendants post-closing is hardly the type of insider bargain "that present[s] a special risk of plan underfunding" or one of the "uses of plan assets potentially harmful to the plan" that Congress enacted Section 406(a)(1)(D) to prevent. *Lockheed Corp.*, 517 U.S. at 893. Indeed, the ESOP did not "engage" in the Lease Incentive at all—it was merely a passive shareholder-beneficiary of any funds it otherwise would not have received. The Court should thus dismiss the portion of Count I based on the Lease Incentive.

As for Count III, the Lease Incentive also does not give rise to an actionable claim against GreatBanc under ERISA section 404(a)(1). As noted above, the Lease Incentive allowed PDQ (and its ESOP shareholder) to receive *additional* money through the efforts of the Individual Defendants that Kwik Trip otherwise would not have been obligated to pay. Stated differently, had the Transaction closed without the Lease Incentive—as Plaintiff alleges should have occurred— the ESOP would have received *less*, not more. Ironically, then, the action Plaintiff says GreatBanc should have taken—i.e., *refusing* to follow the voting direction of the ESOP participants, which netted them more than 2.5 times the value of their stock just nine months earlier *plus* additional amounts through the Lease Incentive—is arguably what would have constituted a breach of

8

fiduciary duty.

The Amended Complaint simply provides no facts or even conclusory allegations—not any—that plausibly show GreatBanc acted with disloyalty or imprudence in following the ESOP participants' direction to vote in favor of the Transaction given the Lease Incentive. 29 U.S.C. § 404(a)(1)A-(B). And far from any plausible allegations of "harm to plaintiff" that would also be necessary to plead an actionable breach of fiduciary duty claim, *Allen*, 835 F.3d at 678, the Amended Complaint and the documents incorporated within it demonstrate only that the ESOP received a benefit it otherwise would have forfeited. The portion of Count III based on the Lease Incentive should be dismissed.

### ii.     The Severance Payments

The final "side payments" that Plaintiff challenges are the Severance Payments made to approximately 30 manager-level employees. Plaintiff alleges only the following facts in the Amended Complaint about the Severance Payments: "PDQ, Inc. paid each of Defendants Arnold, Gerand, Troia, and Whaley 'severance pay' in the amount of two times their annual salary, in the form of a lump sum payment." (FAC ¶ 46.) The Information Statement adds that "approximately 26 other manager-level employees" will also receive severance payments and that "[s]everance agreements have been entered into with division managers and office staff (approximately 30 employees) to wind down the business and liquidate assets that are not included in the sale." (Information Statement, Doc. 21-1 at pp. 26 and 42 of 89.) That GreatBanc followed the ESOP participants' voting direction in favor of the Transaction given these facts, accepted as true at this pleadings stage, does not establish an actionable prohibited transaction (Count I) or breach of fiduciary duty (Count III) claim against GreatBanc.

Beginning with Count I, none of the elements for an ERISA section 406(a)(1)(D) claim are plead here. Similar to the 2009 SARs Plan Payments, the Amended Complaint and documents

9

incorporated within it establish that GreatBanc did not "cause" the Severance Payments; rather, they were caused by "[s]everance agreements" entered into between PDQ and certain division managers and office staff. (Information Statement, Doc. 21-1 at 42 of 89.) The first element for any ERISA section 406 claim, i.e., that a fiduciary "cause" the challenged transaction, is therefore not present here. 29 U.S.C. § 1106. Moreover, the ESOP did not "engage in" the Severance Payments—they were corporate liabilities that "PDQ, Inc. paid" (FAC ¶ 46) pursuant to separate agreements between PDQ and approximately 30 different employees. Nor did the Severance Payments involve "the transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D).

Count III likewise fails to state a claim against GreatBanc based on the Severance Payments. As with the other challenged "side payments", the Court cannot draw any "reasonable inference that" GreatBanc breached a fiduciary duty under ERISA section 404(a) from the facts plead in the Amended Complaint, *Iqbal*, 553 U.S. at 678, which establish only that PDQ entered into severance agreements with approximately 30 manager-level employees who were not expected to be retained by Kwik Trip. There are no facts plead—or even conclusory allegations—that state how GreatBanc possibly failed to act with the loyalty or care of a similarly situated prudent trustee by following the ESOP participants' direction to vote in favor of a Transaction which included the Severance Payments, nor how any such failure caused harm to the ESOP.

Indeed, far from any loss, the Amended Complaint and documents incorporated within it establish that the Transaction netted the ESOP participants more than 2.5 times the value of their stock just nine months earlier—from $6,672.60 per share to approximately $17,500 per share—even after PDQ fulfilled its contractual liabilities pursuant to the 2009 SARs Plan Payments and the Severance Payments. (*See* Information Statement, Doc. 21-1 at pp. 32-33 of 89.) The Amended

Complaint ultimately does no more than allege the fact that severance agreements and payments were made, and then includes "[t]hreadbare recitals of the elements of a cause of action", which clearly does "not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). The remaining portion of Count III challenging the Severance Payments should therefore also be dismissed.

**III.  Conclusion**

For the foregoing reasons, and the reasons stated in the Individual Defendants' Motion to Dismiss and Memorandum in Support, the Court should dismiss the Amended Complaint in its entirety with prejudice.

Respectfully submitted,

*/s/ Michael L. Scheier*
Michael L. Scheier (Ohio 0055512)
Brian P. Muething (Ohio 0076315)
Jacob D. Rhode (Ohio 0089636)
Matthew J. Slovin (Ohio 0102029)

KEATING MUETHING & KLEKAMP PLL
One E. 4th Street, Suite 1400
Cincinnati, OH 45202
Tel: (513) 579-6400
Fax: (513) 579-6457
mscheier@kmklaw.com
bmuething@kmklaw.com
jrhode@kmklaw.com
mslovin@kmklaw.com

**GODFREY & KAHN, S.C.**

Todd G. Smith (#1022380)
One East Main Street, Suite 500
Madison, WI 53701-2719
Phone: 608-284-2653
Fax: 608-257-0609
tsmith@gklaw.com

*Attorneys for Defendant GreatBanc Trust Company*

## CERTIFICATE OF SERVICE

I certify that on February 6, 2023, I caused true and correct copies of the foregoing to be filed electronically using the Court's CM/ECF system and to thereby be served upon all registered participants identified in the Notice of Electronic Filing in this matter on this date. This document is available for viewing and downloading on the CM/ECF system.

*/s/ Michael L. Scheier*
Michael L. Scheier