IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
---

BRENDA SZALANSKI, on behalf of
herself, individually, and on behalf of
all others similarly situated,

       Plaintiff,       OPINION AND ORDER

 v.

                       19-cv-940-wmc

MIKE ARNOLD, LEA GEREND,
PHIL TROIA, MIKE WHALEY, and
GREATBANC TRUST COMPANY,

       Defendants,

and

PDQ FOOD STORES, INC. EMPLOYEE
STOCK OWNERSHIP PLAN,

       Nominal Defendant.
---

  Plaintiff Brenda Szalanski is a former employee of now-defunct PDQ Food Stores, Inc., and a participant in the PDQ Employee Stock Option Plan ("ESOP"). In this putative class action, she contends that four PDQ executives and GreatBanc Trust Company, the Trustee of the ESOP, breached their fiduciary duties in negotiating and approving PDQ's October 2017 sale to Kwik Trip in violation of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq*. Before the court are two motions to dismiss, one by defendant GreatBanc and the other by the individual defendants. (Dkt. ##63, 64.) For the reasons that follow, the court will grant both motions.

ALLEGATIONS OF FACT[1]

### A. The Parties

Plaintiff Brenda Szalanski was an employee of PDQ Food Stores from October 2000 until October 2017. She participated in the PDQ Employee Stock Option Plan ("the ESOP"), which was established in 2009, making PDQ employee-owned until its sale to Kwik Trip in October 2017.

Plaintiff asserts claims against defendant GreatBanc Trust Company, along with four executives of PDQ -- defendants Mike Arnold, Phil Troia, Mike Whaley and Lea Gerend. Before the sale of PDQ, Arnold serving as its President, while Troia and Whaley were both Vice Presidents of PDQ. All three of these defendants were also members of the PDQ Board of Directors at the time of sale. While defendant Gerend never sat on its board, she, too, was an "officer" of PDQ.

### B. The PDQ-Kwik Trip Transaction

For various reasons, PDQ's Board of Directors decided to seek a buyer for the company sometime around 2017, ultimately entering into negotiations with Kwik Trip. Because PDQ was employee-owned, it was required to appoint an independent trustee to act on behalf of the ESOP in anticipation of a potential sale. In that fiduciary capacity, GreatBanc was authorized to decide whether voting in favor of or against the transaction was in the ESOP's best interest and consistent with the requirements of ERISA. In its role

---

[1] For purposes of defendants' motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court "accept[s] as true all of the well-pleaded facts in the [amended] complaint and draw[s] all reasonable inferences in favor of" plaintiff. *Jakupovic v. Curran*, 850 F.3d 898, 902 (7th Cir. 2017) (internal citation omitted).

as Trustee of the ESOP, GreatBanc also hired an independent, outside legal and financial advisor, Prairie Capital, to review the Transaction. Prairie Capital then generated a written opinion advising Great Banc that the transaction was fair to the ESOP. The Board also hired a third-party, financial consulting firm, Enterprise Services, Inc. ("ESI"), to evaluate the fairness of the transaction to the company and its shareholder.

After extensive negotiations, Kwik Trip agreed to purchase substantially all of PDQ's assets for $67,400,000 ("the Transaction"). On July 14, 2017, the parties signed and executed an Asset Purchase Agreement in which Kwik Trip acquired 100% of the assets of PDQ. Some of these funds were held back to satisfy certain liabilities and expenses of PDQ, but the remaining proceeds were distributed to the participants in the PDQ ESOP.

On September 1, 2017, participants of the PDQ ESOP were all sent a copy of the "Information Statement" -- an 88-page document detailing the proposed Transaction with Kwik Trip, including a summary of the proposed financial terms of the deal, the fairness opinion of Prairie Capital, GreatBanc's role as the ESOP's Trustee, and potential risk factors associated with the proposed transaction. (Dkt. #67-1.)[2] The Information Statement also disclosed each of the three, challenged payments addressed below, estimating overall that the net purchase amount to be distributed to the PDQ ESOP participants would be $47,120,500, or approximately $17,500 per share of PDQ Stock,

---

[2] Because the Information Statement is referenced repeatedly in plaintiff's amended complaint and central to her claims (Am. Cpt. (dkt. #52) ¶¶ 11, 15, 29, 40, 41, 43), the court considers it for purposes of deciding defendants' motions to dismiss. *See Williams v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013) (On a motion to dismiss, "a court may consider, in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice.")

3

which would be approximately $10,380 per share higher than the value of PDQ stock just nine months before the agreed upon sale.  (*Id*. at p. 33.)

The PDQ Board unanimously voted to approve the Transaction.  Before doing so, the Board conducted its own, separate discussions (excluding the individual defendants given their obvious conflict of interest) and voted on each aspect of the transaction, including the additional compensation to be received by the director defendants.  The Board also voted to recommend that ESOP participants direct GreatBanc as Trustee to vote for the proposal to approve the transaction in its entirety.  The ESOP participants agreed, and GreatBanc followed their directive by voting the ESOP's shares in favor of the Transaction, which closed on October 10, 2017.  At that time, *all* ESOP participants became fully vested in their ESOP accounts.  Minus liabilities and expenses, the proceeds of the sale were then distributed to the ESOP participants pro rata, and the ESOP was terminated effective January 31, 2018, by resolution of the PDQ Board.

### C. Challenged Payments

Plaintiff does not challenge the per-share ESOP price that was paid as part of the Transaction.  Instead, she challenges the following, three "side payments" to the individual defendants:

- PDQ's payment of $4.96 million to the individual defendants owed under a Stock Appreciation Rights Plan and Grant Agreements that were established in 2009 ("SARs Payments");
- Incentive payments to the individual defendants to earn from Kwik Trip up to $1.85 million for PDQ (and the ESOP) and up to $1.85 million for themselves

- by successfully negotiating long-term leases or purchases of select properties on behalf of Kwik Trip after the transaction ("Lease Incentive"); and

- Severance payments to approximately thirty office and division PDQ employees, including the individual defendants ("Severance Payments").[3]

OPINION

Plaintiff alleges three claims under ERISA based on these three, challenged side payments. In Count I, plaintiff claims that GreatBanc caused the ESOP to engage in a "prohibited transaction" in violation of ERISA § 406(a), 29 U.S.C. § 1106(a), by voting in favor of the Transaction that included these side payments. In Count II, plaintiff claims that the four individual defendants knowingly participated in a prohibited transaction in violation of § 406(a), 29 U.S.C. § 1106(a), for the same reason. Finally, in Count III, plaintiff claims that GreatBanc breached its fiduciary duties by approving those side payments as part of the Transaction in violation of ERISA § 404(a)(1)(A) and (B). *See* 29 U.S.C. § 1104(a)(1)(A) and (B).

---

[3] In her original complaint, plaintiff challenged two, additional "side payments" -- a payment of $1 million to each individual defendant in exchange for non-compete agreements and a $2 million payment to defendant Arnold for an option to purchase property he owned. (Dkt. #1.) She also brought several claims against the individual defendants alleging that they were fiduciaries. The court previously granted defendant GreatBanc's motion to dismiss plaintiff's claims based on those two side payments, as well as the individual defendants' motion to dismiss all plaintiff's claims against them. (Dkt. #47.) Approximately six months later, plaintiff filed an amended complaint against GreatBanc and the individual defendants, challenging only the three side payments discussed here. (Dkt. #52.)

The individual defendants and GreatBanc filed separate motions to dismiss, but their arguments are overlapping so the court considers them together.[4] To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual allegations to state "facially plausible" claims for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court will address each challenged side payment separately considering whether plaintiff's amended complaint permits an inference that the side payments were "prohibited transactions" and the result of a fiduciary breach in violation of ERISA.

In particular, ERISA prohibits a plan fiduciary from "caus[ing] the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan." ERISA § 406(a)(1)(D); 29 U.S.C. § 1106(a). The Supreme Court has explained § 406 was enacted to address "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length." *Lockheed v. Spink*, 517 U.S. 882, 893 (1996). Accordingly, "'transactions' identified in § 406(a) . . . generally involve uses of plan assets that are potentially harmful to the plan." *Id.* ERISA also imposes a duty of loyalty and prudence on all plan fiduciaries. 29 U.S.C. § 1104(a)(1)(A)–(B). To state a claim for breach of a fiduciary duty under ERISA, the plaintiff must plead that: (1) defendant is a plan fiduciary; (2) defendant breached its

---

[4] The individual defendants argue separately that the new claims asserted against them are barred by the applicable statute of limitations and that plaintiff has not alleged that the individual defendants "knowingly" participated in prohibited transactions. Because the court concludes that the claims must be dismissed for other reasons, it need not resolve these issues.

6

fiduciary duty; and (3) the breach resulted in harm to the plaintiff. *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016).

I.   **Stock Appreciation Rights Plan Payments**

In April 2009, PDQ adopted the SARs Plan in an effort to retain and incentivize key employees vital to PDQ and reward the success of certain other, individual employees.[5] (SARs Plan (dkt. #67-3) 3.)  That plan was never modified after its adoption.  Under the SARs Plan, a total of 737.5 units were granted to the individual defendants under four, separate Grant Agreements.  (Dkt. #67-4–67-7.)  These 737.5 SARs units were fully vested as of April 30, 2015 (*id.* at § 3(a)(setting forth vesting schedule), but remained unpaid and outstanding at the time of the October 2017 Transaction.  (Information Statement (dkt. #67-1) 17, 43.)[6]  Thus, under the terms of the 2009 SARs Plan and the individual defendants' Grant Agreements, PDQ was contractually obligated to pay the individual defendants all of the vested SARs units at the time of the October 2017 Transaction.

Nevertheless, plaintiff contends that GreatBanc and the individual defendants caused the ESOP to engage in a "prohibited transaction" in violation of ERISA § 406(a)(1)(D) because the money would "ultimately have been distributed to Plan

---

[5] The SARs Plan and individual Grant Agreements are cited and incorporated into plaintiff's amended complaint (Am. Cpt. (dkt. #52) ¶¶ 47–50) appropriately considered with the amended complaint in resolving a Rule 12(b)(6) motion to dismiss.  *See Williams*, 714 F.3d at 436.

[6] Even if the SARs units had not already vested before the October 2017 Transaction, the Grant Agreements further provided that the individual defendants would "immediately vest in 100% of his/her Stock Appreciation Rights . . . if (i) there is a Change in Control of PDQ during Participant's employment."  (Grant Agreements (dkt. #67-4–67-7) § 3(b).)  Thus, the SARs necessarily vested as part of the Transaction, whether or not they had already vested.

participants through the liquidation of PDQ" if the SARs Payments had not been made: thus, "these payments reduced dollar for dollar the amounts that participants would receive." (Plt's. Opp'n (dkt. #69) 17.) This contention is simply incorrect on the face of the Information Statement and SARs Plan documents, which spells out that the ESOP was *never* entitled to SARs Plan money. Rather, the SARs Payments were owed under a preexisting, legal obligation and would have existed regardless of any action or inaction by GreatBanc related to the Transaction. Tellingly, plaintiff does not allege what, if anything, GreatBanc, let alone PDQ, could have done to invalidate that contractual obligation. Accordingly, the SARs Payments were not a prohibited transaction, having never been prt of any transfer of plan assets from the outset. Moreover, even if ESOP assets were indirectly affected, as plaintiff argues, the allegations in her Amended Complaint do not permit a reasonable inference that *GreatBanc or any of the individual defendants* "caused" the transaction. ERISA § 406(a)(1)(D); 29 U.S.C. § 1106(a). Rather, as previously explained, the payment was "caused" by the pre-existing 2009 contractual agreements between PDQ, Inc. and the individual defendants.

While plaintiff nevertheless attempts to compare the SARs Payments to the transactions deemed prohibited under ERISA in *Chesemore v. Alliance Holdings, Inc.*, 886 F. Supp. 2d 1107 (W.D. Wis. 2012), the two cases are nothing alike. In *Chesemore*, an individual fiduciary conspired with his own company to purchase a business with an ESOP, folded that ESOP into his own company's ESOP, and inflated the value paid by the ESOP to increase his own personal phantom stock payments, ultimately leaving the underlying purchased business and its ESOP worthless. *Id.* at 1012, 1017; *see also Chesemore v. Fenkell*, 829 F.3d 803, 808 (7th Cir. 2016). The fiduciary further arranged the transactions so

they would occur without any meaningful independent scrutiny. *Chesemore*, 886 F. Supp 2d at 1054. Thus, the "prohibited transactions" at issue were payments to the fiduciary himself, including $2.9 million in phantom stock payments. *Id.* at 1055–57. In contrast, the SARs Payments here were: required by *preexisting* contractual obligations of PDQ, rather than arranged contemporaneously to favor a fiduciary; paid to non-fiduciary employees; and disclosed as part of a transaction that left the ESOP participants with a significant increase in the value of their shares.

For similar reasons, plaintiff also has not adequately pleaded a breach of fiduciary duty claim against GreatBanc under ERISA § 404(a)(1)(A) or (B) based on the SARs Payments. Admittedly, in its role as outside trustee, and at the direction of the ESOP participants, GreatBanc voted in favor of the Transaction despite the 2009 SARs Plan Payments, but it, too, was *not* involved in the original structuring the SARs Plan, could not have helped PDQ avoid its contractual obligations under the that Plan, and had no reasonable basis for objecting to the Transaction based on the SARs Payments. Accordingly, the portions of plaintiff's claims against defendants based on the SARs Payments must be dismissed.

II. **Lease Incentive Payments**

Plaintiff next challenges the "Lease Incentive" provision in the Transaction, under which Kwik Trip offered to pay an additional $3.2 million "lease adjustment" if the individual defendants could successfully negotiate long-term leases or purchases of properties at market rates on behalf of Kwik Trip within 18 months of closing. As part of the October 2017 Transaction, this provision was included because *Kwik Trip* assumed

9

PDQ's leases on a number of properties for which it desired to secure a long-term lease or outright purchase. (Information Statement (dkt. #67-1) 42.) More specifically, Kwik Trip insisted in arms-length negotiations that four of those properties required an aggregate $3.2 million *decrease* in the purchase price it agreed to pay PDQ, *unless* the individual defendants could satisfy the "Lease Incentive" provision. (*Id.*; *see also* Exhs. A and D to Information Statement.) Accordingly, if the individual defendants were successful in their efforts, Kwik Trip agreed to pay up to the full $3.2 million "lease adjustment," with any such increase in the purchase price would be split 50/50 between the individual defendants and he ESOP to incentivize both to make these leases longer term. (*Id.*)

Nevertheless, plaintiff contends that the Lease Incentive Payments were "prohibited transactions" under ERISA § 406(a)(1)(D) because $3.2 million otherwise would have been included in the purchase consideration for PDQ's assets. (Am. Cpt. (dkt. #52) ¶ 51.) However, plaintiff's allegations are directly contradicted by the arms-length negotiated term in both the Information Statement and Asset Purchase Agreement. (Dkt. #67-1 Ex. C at §§ 8.6(b), 8.8.) Rather, these documents state that Kwik Trip would *subtract* $3.2 million from the purchase price *unless* the individual defendants could satisfy the Lease Incentive requirements. Thus, the Lease Incentive did not "use" or "transfer" any "assets of the plan" for the benefit of a party in interest as required to establish a violation of § 406(a)(1)(D); instead, the Lease Incentive Payments earned money from Kwik Trip for PDQ (and ultimately, the ESOP shareholder) that otherwise would been have lost as a "lease adjustment" to the purchase price. In other words, the incentive *increased* the Transaction proceeds as a result of efforts by the individual defendants post-closing without using any plan assets at all.

Moreover, plaintiff's allegations provide no basis to infer that PDQ or the ESOP, let alone *GreatBanc*, could have demanded that Kwik Trip pay the $3.2 million without the Lease Incentive provision. Nor do the Lease Incentive Payments give rise to a separate breach of fiduciary duty claim against GreatBanc under ERISA § 404(a)(1). The Lease Incentive allowed the ESOP to receive additional money that Kwik Trip otherwise would not have been obligated to pay. Again, if the Transaction closed without the Lease Incentive -- as plaintiff argues should have occurred -- the ESOP would have received *less* money, not more. Under these circumstances, GreatBanc did not breach any duty of loyalty, prudence, or other fiduciary obligation by following the ESOP participants' direction to vote in favor of the Transaction, including the Lease Incentive provision, and the portions of plaintiff's claims based on the Lease Incentive Payments must be dismissed as well.

### III. Severance Payments

The final "side payment" that plaintiff would challenge involves the Severance Payments made to the individual defendants. PDQ actually made severance payments to approximately 30 manager-level employees, but plaintiff challenges only those made to the individual defendants. According to the Information Statement provided to the ESOP members, the severance payments were made under the terms of severance agreements entered into with division managers and office staff "to wind down the business and liquidate assets that are not included in the sale." (Information Statement (dkt. #67-1) 26, 42.)

11

Plaintiff contends that the Severance Payments were also "prohibited transactions" because they reduced the assets of the ESOP for the benefit of the individual defendants. However, the court agrees with defendants' arguments for dismissal once again because plaintiff has failed to plead any of the elements of a prohibited transaction claim under ERISA § 406(a)(1)(D). To begin, GreatBanc did not "cause" the Severance Payments; rather, the payments were caused by severance agreements entered into between PDQ and certain division managers and office staff years before the proposed sale to Kwik Trip was ever on the table. In addition, the ESOP did not "engage in" the Severance Payments -- they were corporate liabilities that PDQ paid consistent with preexisting contractual obligations. Nor did the Severance Payments involve "the transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D).

The Severance Payments are also entirely different from the transactions at issue in the cases cited by plaintiff. For example, in *Leigh v. Engle*, 727 F.2d 113 (7th Cir. 1984), to which plaintiff cites repeatedly, a plan administrator invested trust assets in a specific corporation in order to assist the management of that corporation in its "quest for corporate control or a control premium." *Id*. at 126. The Seventh Circuit further stated that these investments could be "prohibited transactions" under § 406(a)(1)(D) because the targeted corporation *was* a "party in interest." Such investment decisions by a plan fiduciary for its own benefit are readily distinguishable from GreatBanc's approval of the October 2017 Transaction. The other cases cited by plaintiff are similarly inapposite. *E.g.*, *Hurtado v. Rainbow Disposal Co.*, No. 17 CV 01605, 2018 WL 3372752 (C.D. Cal. July 9, 2018) (two corporate executives' procurement of *post*-transaction employment agreements fell within the scope of ERISA because the transaction involved the sale of stock held by

the plan, *not* the sale of corporate assets); *Chao v. Linder*, No. 05-CV-3812, 2007 WL 1655254, *6 (N.D. Ill. May 31, 2007) (§ 406(a)(1)(D) applies to fiduciaries' receipt of motorcycles from plan administrator).

Finally, plaintiff fails to state a claim against GreatBanc for breach of a fiduciary duty related to the Severance Payments. As with the other challenged "side payments," there is no reasonable inference that PDQ's severance agreements with 30 manager-level employees, who were not expected to be retained by Kwik Trip, somehow breached a duty of loyalty, prudence or any other fiduciary obligation by GreatBanc. Notably, plaintiff cites *no* case in which a fiduciary trustee was held liable for the decision of a sponsor company to make severance payments to non-fiduciary employees as part of a business decision intended to benefit employees expected to lose their jobs as a consequence of an asset sale.

Because plaintiff's Amended Complaint fails to state any claim upon which relief may be granted, it will be dismissed under Federal Rule of Civil Procedure 12(b)(6). The dismissal will be with prejudice because further amendment would be futile. *See Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 707 (7th Cir. 2021) (court may deny leave to file amended pleading "if amendment would be futile"). Plaintiff has filed two complaints already, and has presented the relevant documents to the court, yet the allegations of the Amended Complaint and the documents incorporated within still show that: (1) all details of the proposed asset sale were disclosed to the ESOP participants in an extensive Information Statement, including information describing each of the three "side payments" that plaintiff continues to challenge; (2) the ESOP participants voted in favor of the deal, directing GreatBanc to approve the asset sale despite these side payments;

13

and (3) the asset sale to Kwik Trip netted ESOP participants approximately $17,500 per share -- an increase of 162% in the fair market value determined just nine months earlier. Since nothing about these facts permit a reasonable inference that a prohibited transaction occurred here, that GreatBanc breached any fiduciary duty, or that GreatBanc should have rejected the ESOP participants' direction due to the side payments, the case will be dismissed without leave to amend further.

## ORDER

IT IS ORDERED that:

1) Defendant GreatBanc Trust Company's motion to dismiss (dkt. #63) is GRANTED.

2) Defendants Mike Arnold, Lea Gerend, Phil Troia and Mike Whaley's motion to dismiss (dkt. #65) is GRANTED.

3) Plaintiff's amended complaint is DISMISSED with prejudice.

4) Plaintiff's motion to certify class (dkt. #77) is DENIED as moot.

5) The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 20th day of June, 2025.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge